J-S11036-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| BRIAN BRADLEY GILES | : | |
| Appellant | : | No. 1537 WDA 2024 |

Appeal from the Judgment of Sentence Entered August 13, 2024
In the Court of Common Pleas of Cambria County Criminal Division at
No(s): CP-11-CR-0000856-2022

BEFORE: LAZARUS, P.J., STABILE, J., and NEUMAN, J.

MEMORANDUM BY LAZARUS, P.J.: **FILED: June 5, 2026**

Brian Bradley Giles appeals from the judgment of sentence, entered in the Court of Common Pleas of Cambria County, after he was convicted by a jury of first-degree murder[1] and aggravated assault[2] and sentenced to life in prison without possibility of parole. Giles argues that the evidence was insufficient to support his convictions and that the trial court improperly admitted unduly prejudicial evidence under Pa.R.E. 404(b) as well as unauthenticated social media posts. Upon careful review, we affirm.

The trial court summarized the relevant facts as follows:

> On October 14, 2018, a woman by the name of Nancy Giles (hereinafter "[Nancy]") was reported missing by her mother, Margaret Singer. [Nancy] was in the habit of calling her mother

---

[1] 18 Pa.C.S.A. § 2501(a).

[2] *Id.* at § 2702(a)(1).

every day[] and, that date, her mother never received a call from [Nancy]. Ms. Singer called the police that day.

[Giles] and [Nancy] had a volatile relationship and marriage. [Giles] would often accuse [Nancy] of having sexual affairs with other men. In the summer of 2018, [Giles] threatened to "bash [Nancy's] head in with a rock and bury her in the woods" the next time she cheated on him. In October of 2018, [Nancy] was preparing to move out of the home she shared with [Giles] and leave the marriage.

In September of 2018, [Giles] and [Nancy] were seen at the bottom of a trail located on Roosevelt Boulevard by the Little Conemaugh River (also known as the James Wolfe Sculpture Trail) in the city of Johnstown, PA. About a week later, [Giles] was seen alone at the same spot. Sometime before [Nancy] disappeared, [Giles] had kicked her out of their home, and [Nancy] was staying with friends [ ]. The night she went missing, she left [the friends'] house to meet with [Giles]. She did not take her belongings with her.

On October 14, 2018, a Facebook account under the name of "Brian and Nancy Giles" was deleted. That same day, a new Facebook account under the name "Bradley Giles" was created. The relationship status on the account was "Single[]" and, on October 16, 2018, [Giles[3]] sent a message that read, "[G]etting a divorce from Nancy, my cheating wife. Her doing other men isn't my thing." In the days following the account's creation, several friend requests to other women were made by the account.

Sometime after October 14, 2018, at a soup kitchen in downtown Johnstown, [Giles] said that he killed [Nancy] and that nobody would find her. On October 30, 2018, [Giles] left handwritten notes on the door of the Peer Empowerment Networks drop-in center [ ]. [Nancy] and [Giles] would often frequent the drop-in center. The notes stated that [Nancy] was "fine and okay."

On November 1, 2018, Officer Amber Noel of the Johnstown Police Department met [Giles] at his residence. [Giles] gave [O]fficer Noel a handwritten log of each time he had seen [Nancy] in the

---

[3] This message was sent by the "Bradley Giles" account, which Giles claims was not properly authenticated as belonging to him. **See** Commonwealth Ex. 11 at p. 3; N.T. Jury Trial, 6/3/24, at 137; **see also** Appellant's Brief, at 17–20.

month of October[] 2018. [Giles] wrote that he saw or talked to [Nancy] on three separate occasions after October 14, 2018— October 16, 18, and 25. [Giles] told Officer Noel that he did not know where [Nancy] was[,] but assumed she was with friends; he also said he saw [Nancy] on October 30, 2018.

On May 26, 2019, the skeletal remains of [Nancy] were found on the James Wolfe Sculpture Trail located on Roosevelt Boulevard in the city of Johnstown, PA. The Commonwealth's forensic anthropologist found blunt force perimortem trauma (trauma that took place around the time of death) on the ribs and skull of the skeletal remains. The right side of the skull was in fragments[,] and the cranium was missing the face, which are indications that a significant force removed the face from [Nancy]. On the back of the head was an unhealed depressed fracture. The forensic anthropologist estimated that the remains were anywhere from six months to a year old. The Commonwealth's forensic pathologist testified that, based on the blunt force trauma injuries, [Nancy]'s cause of death was homicide.

On May 13, 2022, Brian Giles was charged with criminal homicide and aggravated assault. On May 19, 2022, [Giles] wrote a letter to his then-counsel[4] stating that, in October of 2018, [Nancy] fell in the bathroom of their house, hit her head off the corner of the sink, started seizing, and died. [Giles] said that he and a friend [] took [Nancy]'s body and buried her. In another letter to his then-counsel dated June 27,[5] 2022, [Giles] recanted his statement.

At trial, the Commonwealth's biomechanical engineer and accident reconstructionist testified to the injuries found on [Nancy]'s skeletal remains in light of [Giles'] statements as to how [Nancy] died:

---

[4] While the May 2022 letter was addressed to Giles' attorney, it was also sent to the district attorney's office and the court. *See* N.T. Jury Trial, 6/5/24, at 32–33. The parties stipulated that Giles sent this letter, as well as subsequent letters, to the Cambria County Clerk of Courts from the prison with the request to file it on the trial docket. *Id.* at 33–34.

[5] The letter the trial court appears to reference here is dated June 2, 2022, and was filed on July 5, 2022. *See* Commonwealth Ex. 33; N.T. Jury Trial, 6/5/24, at 58.

So[,] my conclusion or findings were that the injuries, the depressed skull fracture and the frontal Le Fort (or blunt force trauma) fracture to the front of the face consisted of two separate impacts and contacts to the head, and that likely they occurred as the result of an object hitting [Nancy in] the back of her head and her fac[e] as opposed to her falling and contacting something as a result of that. And as well as the fact that the rib fractures require contact to the chest or sternum area, and that based on that, these injury mechanisms and how the injuries would have been produced are entirely inconsistent with [Nancy] somehow falling backwards [and] striking the back of her head on the edge of the sink.

Trial Court Opinion, 4/3/25, at 1–4 (internal citations omitted) (some alterations in original).

On January 5, 2024, Giles filed a supplemental[6] pretrial motion *in limine* to preclude the introduction or referencing of

any Facebook activity associated [with] the [Bradley Giles[7]] Facebook profile referenced at [Giles'] preliminary hearing[,] on the basis that said profile has not been authenticated, and any social media posts associated therein are hearsay, and more importantly are highly prejudicial to [Giles].

Supplemental Motion *In Limine*, 1/5/24, at 2 ¶ 6, citing **Commonwealth v. Mangel**, 181 A.3d 1154 (Pa. Super. 2018). The supplemental pretrial motion also sought exclusion of evidence referenced in the Commonwealth's Notice of Intent Under Pa.R.E. 404(b), specifically,

---

[6] On February 24, 2023, Giles filed an omnibus pretrial motion raising various claims unrelated to this appeal.

[7] The motion *in limine* incorrectly refers to this Facebook account as that of "Brian Giles," but the relevant account was associated with the name "Bradley Giles."

- 4 -

evidence that the defendant and the victim in this case were in a volatile and abusive relationship prior to the victim's disappearance. In the course of this relationship, the defendant would accuse the victim of being unfaithful to him. This evidence is relevant to demonstrate defendant's motive and intent. It is also relevant to demonstrate lack of mistake and identity.

Supplemental Motion *In Limine*, 1/5/24, at 5 ¶ 16, quoting Commonwealth's Notice of Intent Pursuant to Pennsylvania Rule of Evidence 404(B), 9/18/23.

A hearing on the supplemental motion *in limine* was held on January 11, 2024. Giles and the Commonwealth filed memoranda of law on the motion on January 18, 2024, and January 19, 2024, respectively. On February 14, 2024, the trial court denied Giles' motion.

A four-day jury trial commenced on June 3, 2024. On June 6, 2024, Giles was convicted of first-degree murder and aggravated assault. On August 13, 2024, he was sentenced to life in prison without possibility of parole.

Giles did not file a post-sentence motion. He filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. He raises three issues for our review:

1. Whether the evidence was insufficient to sustain the guilty verdict of criminal homicide and aggravated assault?

2. Whether the trial court committed reversible error in allowing and admitting into evidence the Commonwea[lth]'s [Rule] 404(b) evidence pursuant to the Commonwea[lth]'s Notice of Intent dated September 18, 2023?

3. Whether the trial court committed reversible error in admitting into evidence the alleged social media activity of [Giles,] in that it could not properly be authenticated to actually being the social media activity of [Giles]?

Appellant's Brief, at 6 (unnecessary capitalization removed).

Before proceeding to the merits of Giles' appeal, we address the trial court's determination that Giles waived his sufficiency challenge "by not specifying the element or elements as to which the evidence was insufficient." Trial Court Opinion, 4/3/25, at 4.

"[W]hen challenging the sufficiency of the evidence on appeal, [an appellant's Rule] 1925[(b)] statement must specify the element or elements upon which the evidence was insufficient in order to preserve the issue for appeal." *Commonwealth v. Gibbs*, 981 A.2d 274, 281 (Pa. Super. 2009), quoting *Commonwealth v. Williams*, 959 A.2d 1252, 1257 (Pa. Super. 2008) (internal quotation marks omitted); *see also Commonwealth v. Tyack*, 128 A.3d 254, 260 (Pa. Super. 2015). In his Rule 1925(b) statement, Giles asserts only that the evidence was insufficient to support either of the charges for which he was convicted. Thus, the trial court correctly finds this issue waived. *Gibbs*, *supra*.

Furthermore, as the trial court found, even if this issue were not waived, it is meritless. Our standard of review for a sufficiency claim is well-established:

> [W]hether[,] viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not [re-]weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that[,] as a matter of law[,] no probability of fact

may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced[,] is free to believe all, part[,] or none of the evidence. Furthermore, when reviewing a sufficiency claim, our Court is required to give the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

*Commonwealth v. Bostick*, 958 A.2d 543, 560 (Pa. Super. 2008), quoting

*Commonwealth v. Smith*, 956 A.2d 1029, 1035–36 (Pa. Super. 2008) (en banc).

To establish that an individual has committed first-degree murder, the Commonwealth must prove that "a human being was unlawfully killed; the person accused is responsible for the killing; and the accused acted with specific intent to kill."[8] *Commonwealth v. Housman*, 226 A.3d 1249, 1271 (Pa. 2020). The Commonwealth may meet this burden by means of wholly circumstantial evidence. *Id.*

"A person is guilty of aggravated assault if he [] attempts to cause serious bodily injury[9] to another, or causes such injury intentionally,

---

[8] Under the Pennsylvania Crimes Code, "[a] person is guilty of criminal homicide if he intentionally, knowingly, recklessly[,] or negligently causes the death of another human being." 18 Pa.C.S.A. § 2501. "A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing." *Id.* at § 2502.

[9] "Serious bodily injury" is defined as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement,
*(Footnote Continued Next Page)*

knowingly[,] or recklessly under circumstances manifesting extreme indifference to the value of human life[.]" 18 Pa.C.S.A. § 2702. As with first-degree murder, intent to cause serious bodily injury may be established by wholly circumstantial evidence. *See, e.g.*, *Interest of N.A.D.*, 205 A.3d 1237, 1240 (Pa. Super. 2019). It may be inferred from acts or conduct or from attendant circumstances. *See, e.g.*, *Commonwealth v. Lewis*, 911 A.2d 558, 564 (Pa. Super. 2006), quoting *Commonwealth v. Alford*, 880 A.2d 666, 671 (Pa. Super. 2005).

In the instant case, the trial court set forth its reasons for concluding the evidence was sufficient to support the charges:

> At trial, the Commonwealth presented evidence of [Giles'] volatile and abusive relationship with [Nancy].[10] He would accuse [Nancy] of cheating on him and verbally threaten her.[11] After

---

or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S.A. § 2301.

[10] *See, e.g.*, N.T. Jury Trial, 6/3/24, at 67 (Joann Eritano, director of Peer Empowerment Network drop-in center, testifying she witnessed Giles "demoralizing [Nancy], snapping at her, fighting"); *id.* at 109 (Robert Stewart, neighbor, testifying Giles would tell Nancy he loved her but then "turn around and be battling her," and was "nasty" to her); *id.* at 115 (Stewart testifying Nancy would come to him when she was locked out of marital home); *id.*, 6/4/24, at 113–15 (Maryann George, Peer Empowerment Network worker, testifying Giles would humiliate Nancy publicly and "degrade her," and would throw her out of house).

[11] *See, e.g.*, N.T. Jury Trial, 6/3/24, at 67–68 (Eritano testifying Giles would not let Nancy engage in activities because he believed she was having sexual encounters with other men "anywhere they went," and that he had "trust issues"); *id.* at 72 (Eritano testifying Giles would become angry if Nancy "showed a little skin"); *id.* at 77 (John Teston, Giles' relative, testifying Giles
*(Footnote Continued Next Page)*

[Nancy] went missing, [Giles] made statements to various individuals that he killed [Nancy] and buried her.[12] [Giles] wrote letters with conflicting statements about seeing [Nancy] after she went missing, and he lied to law enforcement officers about knowing [Nancy]'s whereabouts.[13] After [Giles] was charged with first-degree murder and read the affidavit of probable cause for his case, he then constructed another version of events to explain what happened the night [Nancy] died.[14] Shortly afterwards, he recanted this statement.[15]

---

verbally threatened Nancy); *id.* at 109 (Stewart testifying he witnessed Giles calling Nancy a "slut"); *id.*, 6/4/24, at 110–12 (George testifying she saw Giles fight with Nancy because he believed she was talking to other men, or they were talking to her; he "pretty much told everybody when he felt that Nancy was being promiscuous").

[12] *See* N.T. Jury Trial, 6/3/24, at 77 (Teston testifying Giles told him "he assumed [Nancy] was cheating on him, and [] next time she cheats on him, he is going to bash her head in with a rock and bury her in the woods"); *id.* at 98 (Susan Sullivan, friend with whom Nancy stayed, testifying Giles told her "he killed [Nancy] and [] nobody would know where she's at"); *id.*, 6/5/24, at 31–32 (Detective Sergeant Cory Adams testifying Teston told him about Giles' statement about beating Nancy's head in with rock, which Teston communicated to Adams before information about manner of Nancy's death publicly released).

[13] *See, e.g.*, Commonwealth Exs. 19–22, 24; N.T. Jury Trial, 6/4/24, at 98–99, 101–02, 115–16, 122, 125, 127–29; *id.*, 6/5/24, at 5–6, 11-12 (law enforcement officers and lay witnesses recounting various, and sometimes conflicting, statements by Giles about whether he had seen Nancy or knew where she was after she disappeared).

[14] *See* Commonwealth Ex. 29; N.T. Jury Trial, 6/5/24, at 32–37 (May 19, 2022 letter, authored by Giles, saying Nancy went to shower in his house, he "heard a ruckus" from bathroom and found her on floor, seizing, with blood from her head on floor, and he panicked her and buried her at "inclined plane" in park).

[15] *See* Commonwealth Ex. 33; N.T. Jury Trial, 6/5/24, at 58–59 (June 2, 2022 Inmate Statement, authored by Giles, saying written statement and recorded interview were coerced and he was not around Nancy when she died). Giles gave conflicting written and verbal explanations for Nancy's death and his role
*(Footnote Continued Next Page)*

[Nancy]'s body was found on the same trail at which [Giles] and [Nancy] were seen in September of 2018.[16] Her skeletal remains showed evidence of violent blunt[-]force injuries made with an object to her face, the back of her skull, and her ribs.[17] Expert testimony presented evidence that she died by homicide.[18] [Giles'] description of events did not match the injuries found on her remains.[19]

---

(or lack thereof) in it throughout the case. **See** Commonwealth Exs. 23, 25–26, 30, 34–40, 42–43; N.T. Jury Trial, 6/5/24, at 4–8, 9–10, 60–63, 63–66, 71, 72–73, 76–78, 90–92 (inconsistent written and verbal statements made by Giles in letters, interviews, and reports).

[16] **See** N.T. Jury Trial 6/3/24, at 82 (Terry Hubbard, bank manager, testifying he observed Giles and Nancy together in fall 2018 at trail where Nancy's remains were later recovered; Hubbard observed Giles at same spot, alone, about a week later).

[17] **See** Commonwealth Exs. 13, 14, 16; N.T. Jury Trial, 6/4/24, at 29–35 (Dr. Dennis Dirkmaat, professor of anthropology and forensic sciences, testifying Nancy suffered perimortem rib, skull, and facial fractures, caused by blunt-force trauma); **id.** at 67–70 (Dr. Willis Aston Ennis, forensic pathologist, testifying she identified skull fractures as Le Fort fractures, which indicate significant trauma and are very violent and severe).

[18] **See** Commonwealth's Exs. 14, 16, 17; N.T. Jury Trial, 6/4/25, at 43, 48–49 (Dr. Dirkmaat testifying face and rib fractures were likely inflicted by an instrument; circumstances indicate homicide); **id.** at 72–75 (Dr. Ennis testifying no reason to believe Nancy's death could have been brought about by natural causes; cause of death was homicidal violence of undetermined etiology; injuries not consistent with accidental trauma theory posited by Giles); **id.** at 90 (Jeffrey Lees, coroner, testifying cause of death homicidal violence of undetermined etiology/unspecified means).

[19] **See** Commonwealth Ex. 32; N.T. Jury Trial, 6/5/24, at 48, 50, 52–53 (Dr. Andrew Restschler, biomechanical engineer and accident reconstructionist, testifying injuries reflect multiple impacts or blows to body; head injuries not consistent with backwards fall but rather with being hit on head with object; fractures to anterior ribs and face not consistent with backwards fall; and injuries are inconsistent with mechanism Giles proffered, falling backward and hitting head on vanity).

The Commonwealth presented overwhelming circumstantial evidence proving each element of criminal homicide and aggravated assault beyond a reasonable doubt. [Giles] had the motive and means to kill [Nancy,] as evidenced by the statements he made to friends, acquaintances, and law enforcement. [Giles] abused [Nancy], and [Nancy] was planning on leaving the relationship and their home in the weeks before her death.[20] [Giles] was the last person known to be with [Nancy].[21] [Giles] lied about seeing and talking to [Nancy] after she went missing. [Nancy]'s remains showed evidence of traumatic injuries caused by another person hitting her with enormous force with some object. [Nancy] died as a result of these injuries. The evidence presented proves each element of criminal homicide and aggravated assault beyond a reasonable doubt[] and, for these reasons, the evidence used to sustain the jury's verdict was sufficient.

Trial Court Opinion, 4/3/25, at 6–7.

Giles acknowledges elsewhere in his brief that the Commonwealth presented sufficient expert and medical evidence to establish that Nancy was unlawfully killed, and that the killer acted with specific intent, in light of the extensive and repeated injuries. **See** Appellant's Brief, at 15–16. He argues, however, that the Commonwealth did not present sufficient evidence to

---

[20] **See, e.g.**, N.T. Jury Trial, 6/3/24, at 55 (Nancy's mother testifying Nancy told mother she was going to get her own cell phone and was staying with friends); **id.** at 69 (Eritano testifying Nancy filled out housing application, had support from peers, and was "ready to move on" from being with Giles); **id.**, 6/4/24, at 113–14 (George testifying that: by fall 2018, "things started escalating" between Nancy and Giles; Giles was talking about divorce and Nancy "was slowly beginning to want to stand up for herself, which would lead to more incidents between them" and make Giles speak to her "a little worse;" their relationship "was becoming volatile at that point and Nancy would often come to the center crying;" Nancy was filling out application for housing).

[21] **See** N.T. Jury Trial, 6/3/24, at 97, 99–100 (Sullivan testifying one night toward end of October (could not recall exact date), Nancy called Giles on Sullivan's phone; following morning Nancy was gone from house, did not take belongings with her).

demonstrate he was the perpetrator of the crime. *Id.* at 10–11. We disagree. The Commonwealth introduced overwhelming circumstantial and direct evidence establishing Giles' abusive relationship with Nancy, statements Giles made to others directly implicating himself in the crime, and repeated, and often inconsistent, statements Giles made about Nancy's disappearance and death.[22] Giles' claims do not entitle him to relief.

In addition to his waived and meritless sufficiency claim, Giles also challenges the trial court's admission of the evidence he sought to exclude in his supplemental motion *in limine*: (1) evidence of his "prior bad acts" pursuant to Rule 404(b), which he claims were unduly prejudicial, and (2) records from the "Bradley Giles" Facebook account identified by law enforcement, which he argues were not properly authenticated. *See* Appellant's Brief, at 12–20.

When reviewing a trial court's admission of evidence, we are mindful that the admissibility of evidence is

> a matter for the discretion of the trial court[,] and a ruling thereon will be reversed on appeal only upon a showing that the trial court committed an abuse of discretion. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.

*Commonwealth v. Johnson*, 42 A.3d 1017, 1027 (Pa. 2012) (internal citations and quotation marks omitted).

---

[22] For the same reasons, the evidence was sufficient to demonstrate that Giles caused serious bodily injury to Nancy and did so intentionally.

In arguing that the Commonwealth improperly presented unduly prejudicial evidence, Giles specifically points to the testimony of two Commonwealth witnesses, Nancy's mother—who described drastic changes in Nancy's appearance and Giles' control over Nancy's ability to make phone calls—and Joann Eritano, a worker at the drop-in center—who testified that Giles had serious issues trusting Nancy, accused her of many extramarital affairs, and exerted control over many aspects of her life. *See* Appellant's Brief, at 13. He asserts that "this testimony was only to paint [Giles] as a 'monster' and was highly prejudicial and had no probative value to prove that [Giles] murdered [Nancy]. This evidence was only to make [Giles] look bad and be an unlikeable person to the jury." *Id.* The Commonwealth did not need this evidence to prove intent, Giles argues, because intent can be inferred from conduct, and there was no question Nancy was the victim of an intentional killing. *Id.* at 15–16. Furthermore, Giles' controlling behavior was not admissible to prove lack of mistake or identity, as the prior bad acts were "merely domestic issue[s] and were not of a violent nature." *Id.* at 16. Giles reasons that the previous accusations about him "are not in the same class of activity as the brutal homicide that Nancy Giles endured," and, thus, cannot demonstrate lack of mistake and identity. *Id.*

The Commonwealth responds that evidence providing background information about the couple's relationship demonstrated that Giles believed he had reason to kill Nancy, which was probative of motive; the Commonwealth needed to introduce evidence of intent after Giles alleged in a

letter that Nancy's death was accidental; and the evidence was relevant to identity, because Giles accused other people of committing the crime. **See** Appellee's Brief, at 13–14.

Admissibility depends on relevance and probative value. **Commonwealth v. Drumheller**, 808 A.2d 893, 904 (Pa. 2002). "All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa.R.E. 402. "Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable[,] or supports a reasonable inference or presumption regarding a material fact." **Drumheller**, 808 A.2d at 904. However, "[t]he court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403.

Evidence of prior crimes, wrongs, or bad acts "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character or trait." Pa.R.E. 404(b)(1). However, it may be admitted "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Pa.R.E. 404(b)(2). The Pennsylvania Supreme Court has also recognized "a *res gestae* exception which allows admission of other crimes evidence when relevant to furnish the context or complete story of the events surrounding a crime." **Commonwealth v. Dillon**, 925 A.2d 131, 137 (Pa.

- 14 -

2007); *see also Commonwealth v. Lark*, 543 A.2d 491, 497 (Pa. 1988) (evidence of other crimes relevant and admissible to show "part of the chain or sequence of events which became part of the history of the case and formed part of the natural development of the facts;" *res gestae* exception also known as "complete story" rationale, where evidence is admissible "to complete the story of the crime on trial, by proving its immediate context of happenings near in time and place").

Instantly, despite Giles' argument that this evidence "had no probative value" to prove he murdered Nancy, "evidence of prior abuse between a defendant and a homicide victim tending to establish motive, intent, malice, or ill[-]will is generally admissible." *Commonwealth v. Jackson*, 900 A.2d 936, 940 (Pa. Super. 2006), quoting *Commonwealth v. Passmore*, 857 A.2d 697, 711 (Pa. Super. 2004) (citation omitted); *see also Drumheller*, 808 A.2d at 905 (evidence of prior abuse "demonstrates [defendant]'s motive, malice, intent, and ill-will toward" victim); *Commonwealth v. Ulatoski*, 371 A.2d 186, 190 (Pa. 1977) (Pennsylvania Supreme Court has stated "[o]n [m]any occasions" that "evidence concerning the previous relations between a defendant and a homicide victim," including "evidence concerning the nature of the marital relationship" when defendant and victim are married, "is admissible for the purpose of proving ill[-]will, motive[,] or malice.").

For example, much of the evidence Giles challenges was admissible to prove motive for what might otherwise have appeared to be a senseless crime: his persistent belief that Nancy was cheating on him. *See Commonwealth*

*v. Hairston*, 84 A.3d 657, 670 (Pa. 2014) (evidence of previous incident relevant to establish motive, "because the prior bad acts were evidence that the murders [with which defendant was charged] grew out of or were in any way caused by the prior incidents") (internal quotation marks and alterations omitted). Director of the drop-in center Joann Eritano, Giles' relative John Teston, the couple's neighbor Robert Stewart, and Peer Empowerment Networks worker Margaret George all testified that, throughout the couple's relationship, Giles accused Nancy of cheating on him and/or prevented her from talking to other men for fear she would be unfaithful. *See supra* note 11. Giles explicitly told his relative, Teston, that he assumed Nancy was cheating on him, and **the next time she cheated on him he would "bash her head in with a rock and bury her in the woods."** N.T. Jury Trial, 6/3/24, at 77 (emphasis added). All this, taken together, demonstrates that the evidence Giles challenges was probative for a purpose other than pure prejudice and, therefore, admissible, as the trial court properly found. *See* Trial Court Opinion, 4/3/25, at 8.

Moreover, despite Giles' concession in his brief that the Commonwealth established specific intent to kill via forensic evidence, the Commonwealth correctly asserts that he called this element into question when he wrote a letter saying Nancy's death was an accident. *See* Commonwealth Ex. 29; N.T. Jury Trial, 6/5/24, at 32–37. Evidence of prior marital discord, in combination with forensic evidence, was probative as to the likelihood of this explanation. *See, e.g.*, *Ulatoski*, 371 A.2d at 192 (testimony presented by

- 16 -

Commonwealth relevant, because it "described a pattern of physical abuse and indicated that [defendant] and [wife] had a stormy marriage," which was probative as to whether shooting was accidental or intentional); **Commonwealth v. Odum**, 584 A.2d 953, 955 (Pa. Super. 1990) (evidence of relations between parties is "an integral point of the evidence establishing the intent of the defendant").

Furthermore, in the instant case, evidence establishing the nature of the interactions between the parties was particularly important to explain the arc of their relationship. Evidence of prior incidents of domestic abuse are admissible "where the distinct crime or bad act was part of a chain or sequence of events which formed the history of the case and was part of its natural development," including those which show "the continual and escalating nature" of a defendant's abuse of the victim. **Drumheller**, 808 A.2d at 905 (internal quotation marks omitted); **see also Hairston**, 84 A.3d at 670 (prior assaults of victim admissible as *res gestae* evidence, because they "formed part of the history, or chain of events, culminating in the homicides;" evidence showed defendant made prior threats, and homicide occurred when "he took action in furtherance of these threats"); **Commonwealth v. Chandler**, 721 A.2d 1040, 1044 (Pa. 1998) (evidence of repeated abuse "was properly admitted not only to establish motive and malice, but also to show the development of the case and the history of events leading up to the murder").

Instantly, Nancy's mother testified that Nancy stopped taking care of herself and became withdrawn after she and Giles began their relationship,

- 17 -

and Joann Eritano testified that Nancy's "happy-go-lucky" demeanor shifted significantly after she became involved with Giles. *See* N.T. Jury Trial, 6/3/24, at 52, 67. Maryann George, the Peer Empowerment Network worker, testified that after Giles and Nancy got together, Nancy stopped coming to programs she used to attend, because Giles believed she might talk to other men at the programs and did not like that. *See id.*, 6/4/24, at 110–12. Nancy's mother and Eritano also testified to the influence Giles wielded over Nancy, saying he controlled whom she called on the phone and when, what she wore, what she did, and where she went, and that she would get things for Giles and "wait on him." *See, e.g.*, *id.*, 6/3/24, at 51–53, 67. Stewart and George testified to witnessing Giles threaten Nancy or be verbally aggressive toward her. *See, e.g.*, *id.* at 67, 109–10; *id.*, 6/4/24, at 114–15.

Furthermore, George testified to the escalation of conflict between the parties as of fall 2018. *See id.* at 113–14. Both Eritano and George testified that by that fall, Nancy was saying she was "ready . . . to move on," and that she and Giles had talked about divorce. *Id.*, 6/3/24, at 68–69; *id.*, 6/4/24, at 113–15. Nancy's mother testified that the last time they spoke, Nancy said she was staying at another couple's house and was going to buy herself a cell phone. *See id.*, 6/3/24, at 55. The trial court did not err in determining this evidence was probative of motive, intent, and the history and context of Giles' relationship with Nancy.

While probative, the trial court still needed to consider whether the challenged evidence was nonetheless overly unduly prejudicial, and therefore

inadmissible under Pa.R.E. 404(b). ***Dillon***, 925 A.2d at 141. "In determining whether evidence of other prior bad acts is admissible, the trial court is obliged to balance the probative value of such evidence against its prejudicial impact." ***Johnson***, 42 A.3d at 1027 (citation omitted).

"Because all relevant Commonwealth evidence is meant to prejudice a defendant, exclusion is limited to evidence so prejudicial that it would inflame the jury to make a decision based upon something other than the legal propositions relevant to the case." ***Commonwealth v. Gonzalez***, 112 A.3d 1232, 1238 n.6 (Pa. Super. 2015), quoting ***Commonwealth v. Owens***, 929 A.2d 1187, 1191 (Pa. Super. 2007); ***see also Commonwealth v. Hicks***, 91 A.3d 47, 53–54 (Pa. 2014) (any probative evidence inherently prejudicial toward one side or other, and evidence that is not probative should not be admitted in first place). Thus, relevant evidence will not be excluded merely because it is harmful to the defendant. ***Dillon***, 925 A.2d at 141. A court is not "required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged." ***Hairston***, 84 A.3d at 666, quoting ***Lark***, 543 A.2d at 501.

In the instant case, the trial court did not err or abuse its discretion in finding that the probative value of this testimony outweighed the risk of undue prejudice. As noted ***supra***, the history of a relationship in which the alleged perpetrator was abusive toward the victim in the past can be critical to the

Commonwealth's case to prove motive and intent. The challenged evidence in this case was no different. **See, e.g.**, **Odum**, 584 A.2d at 955 ("[S]ince the relationship between the decedent and the defendant is of critical importance to the Commonwealth's case and necessary to show intent, any prejudice suffered by the defendant in this instance was outweighed by the fact that the relations between the parties is an integral point of the evidence establishing the intent of the defendant.") (internal quotation marks and alterations omitted). The trial court acknowledged that the challenged evidence was prejudicial to Giles, but determined it was not unduly so; "[t]his evidence helped to paint a picture of the relationship between [Giles] and [Nancy] in the time leading up to her disappearance" and, since it was "relevant to show motive and intent on the part of [Giles], the prejudicial potential of this evidence did not outweigh its probative value." Trial Court Opinion, 4/3/25, at 8. Thus, Giles' challenge to the trial court's decision to admit the Commonwealth's Rule 404(b) evidence is meritless.

Giles also argues that the trial court erred in admitting the content of his Facebook profile, arguing it was not properly authenticated. He analogizes the instant case to this Court's decision in **Mangel**, **supra**, which reversed a defendant's conviction based on the trial court's erroneous admission of evidence from the defendant's Facebook page. **See** Appellant's Brief, at 19–20. Giles argues that in **Mangel**, this Court found the evidence was not properly authenticated where the detective testified that she could not, to a reasonable degree of scientific certainty, say the defendant authored the

messages, and the same is true in the instant case. *Id.* at 20. Giles observes that the case law requires more evidence than the fact that the account is associated with a name similar to that of the defendant, and that Detective Sergeant Adams could not say he knew with one hundred percent certainty whether the profiles of those involved in the conversations were still active. *Id.* The Commonwealth responds that Giles ignores the extensive testimony presented at the motions hearing that carefully detailed the basis for the detective's conclusion that this account was created and used by Giles. *See* Appellee's Brief, at 15. We agree with the Commonwealth and the trial court.

In general, a proponent of evidence must authenticate or identify it before it may be admitted. Under Pa.R.E. 901, "[u]nless stipulated, to satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Pa.R.E. 901(a). Moreover, "[w]hen a party offers evidence contending either expressly or impliedly that the evidence is connected with a person, place, thing, or event, the party must provide evidence sufficient to support a finding of the contended connection." Pa.R.E. 901 cmt.

In May 2020,[23] Rule 901 was amended to explicitly address authentication of digital evidence. The amendment confirms that, like all evidence requiring authentication, the process of connecting digital evidence

---

[23] This amendment took effect on October 1, 2020.

with a person may be accomplished by either direct or circumstantial evidence. *See* Pa.R.E. 901(b)(11). The comment to the updated Rule provides that "[t]he proponent of digital evidence is not required to prove that no one else could be the author. Rather, the proponent must produce sufficient evidence to support a finding that a particular person or entity was the author." Pa.R.E. 901 cmt. While "[c]ircumstantial evidence of ownership, possession, control, or access to a device or account alone is insufficient for authentication of authorship of digital evidence, . . . this evidence is probative in combination with other evidence of the author's identity." *Id.*

In general, "authentication generally entails a relatively low burden of proof. Proof of any circumstances which will support a finding that the writing is genuine will suffice to authenticate the writing." *Commonwealth v. Bowens*, 265 A.3d 730, 759 (Pa. Super. 2021) (en banc) (citations and alterations omitted). As we have recognized,

> social media evidence presents challenges for authentication because of the ease with which a social media account may be falsified, or a legitimate account may be accessed by an imposter. However, we have acknowledged that the same uncertainties can exist with other types of evidence, such as written documents where signatures could be forged, or a letterhead copied.

*Commonwealth v. Jackson*, 283 A.3d 814, 818–19 (Pa. Super. 2022) (internal citations omitted). Thus,

> [i]nitially, authentication [of] social media evidence is to be evaluated on a case-by-case basis to determine whether or not there has been an adequate foundational showing of its relevance and authenticity. Additionally, the proponent of social media evidence must present direct or circumstantial evidence that tends to corroborate the identity of the author of the communication in

- 22 -

question, [including] contextual clues in the communication tending to reveal the identity of the sender. [T]he mere fact that an electronic communication, on its face, purports to originate from a certain person's social networking account is generally insufficient, standing alone, to authenticate that person as the author of the communication.

*Commonwealth v. Danzey*, 210 A.3d 333, 338–39 (Pa. Super. 2019), quoting *Mangel*, 181 A.3d at 1162. In such cases, the content of communications is relevant. *See Danzey*, 210 A.3d at 337; *Commonwealth v. Orr*, 255 A.3d 589, 601 (Pa. Super. 2021) (text messages authenticated where, *inter alia*, messages' content included references to ongoing custody dispute at issue in the case); *Commonwealth v. Murray*, 174 A.3d 1147, 1157 (Pa. Super. 2017) (messages alluding to defendant's arrest on day defendant was arrested and referencing item taken during course of crime at issue, which were consistent with events and chronology of case, were sufficiently authenticated); *In re F.P.*, 878 A.2d 91, 94–95 (Pa. Super. 2005) (authentication proper based on, *inter alia*, accusations in electronic communication which mirrored testimony that defendant was angry about item stolen from him).

In the instant case, Detective Adams testified at the motions hearing that the Facebook account he accessed, via search warrant and identified by the URL specific to this profile, was associated with the name "Bradley Giles," and that Giles' middle name is Bradley. *See* N.T. Pretrial Conference/Motions Hearing, 1/11/24, at 8–9. The date of birth matched that of Giles. *Id.* at 9. The account was created on October 14, 2018, which was the day Nancy Giles disappeared and contained a "selfie" photo of Giles. *Id.* at 10, 11. A

photograph taken inside Giles' residence was included in the profile, which could not have been taken from outside the home because the residence's windows were boarded up; the detective was familiar with the inside of the residence, because he had personally been inside. *Id.* All the "friends" associated with the account were known relatives and associates of Giles. *Id.* at 14. The content of the account's communications with others matched statements Giles made to the police, for example, statements that his wife was missing or gone, that they were getting divorced, and that she was cheating on him. *Id.*

Notably, at trial, Detective Adams repeated much of this testimony, but also testified that the profile account for "Brian and Nancy Giles," a joint account, was deleted the same day the "Bradley Giles" account was created, and the "Bradley Giles" account listed the owner's relationship status as "single." N.T. Jury Trial, 6/3/24, at 136–37. This activity occurred on October 14, 2018, the day Nancy was reported missing. *Id.* at 136. The same day, the owner of the "Bradley Giles" account sent a message: "Getting a divorce from [N]ancy my cheating wife her doing other men isn't my thing. . . . I'm doing good though otherwise." Commonwealth Ex. 11 at p. 3 (ellipsis in original); *see* N.T. Jury Trial, 6/3/24, at 137. The account owner sent a friend request to an account for Nancy Giles on October 15, 2018, and sent five friend requests to other women between October 15 and 16, 2018. *See* N.T. Jury Trial, 6/3/24, at 138.

Comparing the facts of cases decided by this Court in previous cases with the facts presented in this case, the trial court did not abuse its discretion in finding that the Commonwealth introduced sufficient evidence to authenticate the "Bradley Giles" Facebook account as belonging to Giles. The trial court cited circumstantial evidence supporting its finding that the Commonwealth had authenticated the records, in that

> the Facebook profile had 'selfie' pictures of [Giles], birthdates that matched both [Giles] and [Nancy], an email attached to the profile belonging to [Giles], friends on the profile connected to [Giles'] actual friends, and conversations had by the owner of the account that contextually and circumstantially related to [Giles].

Trial Court Opinion, 4/3/25, at 8–9. **Compare Mangel**, 181 A.3d at 1164 ("The mere fact that the Facebook account in question bore Mangel's name, hometown, and high school was insufficient to authenticate the online and mobile device chat messages as having been authored by Mangel. Moreover, there were no contextual clues in the chat messages that identified Mangel as the sender of the messages.") **with Danzey**, 210 A.3d at 339 (sufficient authentication where middle name and date of birth match, profile picture was picture of defendant, and posts contained contextual clues linking defendant to victim and referenced their relationship). Thus, Giles' challenge to this evidentiary ruling is meritless.

We conclude that Giles' sufficiency claim was waived and, in any event, meritless, as the evidence presented by the Commonwealth was sufficient to convict Giles of first-degree murder and aggravated assault. We further

- 25 -

conclude that the trial court did not abuse its discretion in rejecting Giles'

evidentiary claims.  Accordingly, Giles is not entitled to relief.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

6/5/2026